# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

COMMONWEALTH OF MASSACHUSETTS,
*Plaintiff-Appellant*,

v.

U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES *et al.*,
*Defendants-Appellees*.

On Appeal from the United States District Court for the
District of Massachusetts, No. 1:17-cv-11930

**BRIEF FOR PENNSYLVANIA, CALIFORNIA, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAI'I, IOWA, MAINE, MARYLAND, MINNESOTA, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF APPELLANT**

JOSH SHAPIRO
*Attorney General of Pennsylvania*
JONATHAN SCOTT GOLDMAN
*Executive Deputy Attorney General*
MICHAEL J. FISCHER
*Chief Deputy Attorney General*
AIMEE D. THOMSON
*Deputy Attorney General*
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171
mfischer@attorneygeneral.gov

Date: September 24, 2018

(Additional Counsel on
Signature Page)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF AMICI CURIAE ........................................................................1

SUMMARY OF ARGUMENT ...........................................................................2

ARGUMENT .......................................................................................................3

I.  Massachusetts Has Article III Standing Because Its Proprietary
    Interests Will Be Irreparably Harmed by the Rules. ...........................5

    A. Access to Affordable Contraception is Vital to Women's Health
       and Economic Opportunity............................................................5

    B. The Rules Will Cause Women to Lose Contraceptive Coverage,
       Causing Them and Amici States Irreparable Harm........................8

       1.  The Rules Will Cause Hundreds of Thousands of Women
           to Lose Employer-Sponsored Contraceptive Coverage. ...........9

       2.  States Will Bear the Costs of Providing Contraceptive Coverage
           to Women Who Lose It. .........................................................11

       3.  States Will Bear Increased Costs from Unintended Pregnancies
           and Complications When Women Cannot Get Coverage.......................13

II. Massachusetts Has *Parens Patriae* Standing Because the Rules Will
    Injure the Commonwealth's Quasi-Sovereign Interests....................15

    A. Massachusetts Has the Right to Protect Its Quasi-Sovereign Interests.........15

       1.  The Modern Doctrine of *Parens Patriae* Standing Allows
           States to Protect Their Quasi-Sovereign Interests..................16

       2.  Massachusetts Has a Right to Bring a *Parens Patriae* Suit to
           Protect Its Quasi-Sovereign Interests. ....................................22

    B. Prudential Limitations on *Parens Patriae* Standing Do Not Bar
       Massachusetts' Suit. .....................................................................26

CONCLUSION..................................................................................................31

CERTIFICATE OF COMPLIANCE...................................................................35

CERTIFICATE OF SERVICE ...........................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982).......................................................................... passim

*Allen v. Wright,* 468 U.S. 737 (1984) .....................................................4

*Challenge v. Moniz*, 218 F. Supp. 3d 1171 (E.D. Wash. 2016) .............................27

*Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332 (1st Cir. 2000).................16

*Fontain v. Ravenel*, 58 U.S. 369 (1854) .................................................16

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907) .......................... 17, 21, 23

*Hawai'i v. Standard Oil Co. of Cal.*, 405 U.S. 251 (1972) ...................... 16, 2, 3, 4

*Kansas v. Colorado*, 206 U.S. 46 (1907)...................................................17

*Louisiana v. Texas*, 176 U.S. 1 (1900)............................................... 16, 17

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................ passim

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .......................................... passim

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) .................................. 26, 27, 28, 29

*Md. People's Counsel v. FERC*, 760 F.2d 318 (D.C. Cir. 1985) .........................27

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) ..................7, 24

*Missouri v. Illinois*, 180 U.S. 208 (1901) ...................................... 17, 21, 23

*New York v. New Jersey*, 256 U.S. 296 (1921)........................................18

*North Dakota v. Minnesota*, 263 U.S. 365 (1923)..................................18

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................... passim

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)..............................30

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................ 26, 27

**Constitutional Provisions**
U.S. Const. art. III, § 2 ....................................................................3

**Statutes**
29 U.S.C. § 1144(a) .......................................................................7, 24

29 U.S.C. § 1144(b)(2)(A) ..............................................................7, 24

42 U.S.C. § 300gg-13(a)(4) .................................................................24

5 U.S.C. § 553(b) ..............................................................................25

5 U.S.C. § 553(c) ..............................................................................25

5 U.S.C. § 702 ...................................................................................30

5 U.S.C. § 706 ............................................................................ 22, 25

5 U.S.C. § 706(2) ..............................................................................30

Advancing Contraceptive Coverage and Economic Security in our State
(ACCESS) Act, 2017 Mass. Acts ch. 120 ........................................23

**Other Authorities**
3 William Blackstone, Commentaries ..................................................16

Adam Sonfield & Kathryn Kost, *Public Costs from Unintended Pregnancies and
the Role of Public Insurance Programs in Paying for Pregnancy-Related Care:
National and State Estimates for 2010*, Guttmacher Inst. (Feb. 2015) ..............14

Adam Sonfield et al., *The Social and Economic Benefits of Women's Ability to
Determine Whether and When to Have Children*, Guttmacher Inst.
(Mar. 2013) ....................................................................................6

Black's Law Dictionary (10th ed. 2014) ..............................................16

Brief of Massachusetts, Connecticut, District of Columbia, Hawaiʻi, Illinois, Iowa, Maine, Minnesota, North Carolina, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington as Amici Curiae Supporting Appellees, California et al. v. Azar et al. (9th Cir. No. 18-15255) ....................................................................12

Carey Goldberg, *Countering Trump, Mass. Swiftly Passes New Law Ensuring Access To No-Cost Birth Control*, WBUR (Nov. 20, 2017) ..............................24

Guttmacher Inst., *Improving Contraceptive Use in the United States* (May 2008)....................................................................................................7

Guttmacher Inst., *Insurance Coverage of Contraceptives* (Sept. 1, 2018)............2, 7

Guttmacher Inst., *Medicaid Family Planning Eligibility Expansions* (Sept. 1, 2018)...................................................................... 11, 12, 13

Guttmacher Inst., *Publicly Funded Family Planning Services in the United States* (Sept. 2016) ..................................................................11

Henry J. Kaiser Family Found., *2016 Employer Benefits Survey* (Sept. 2016)..................................................................................8, 10

Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* (2011) ................................................................ 5, 6, 7

Jennifer J. Frost et al., *Contraceptive Needs and Services, 2014 Update*, Guttmacher Inst. (Sept. 2016)....................................................................5

Laurie Sobel et al., *The Future of Contraceptive Coverage*, Henry J. Kaiser Family Found. (Jan. 2017) ................................................................7

Pa. Dep't of Human Servs., *Family Planning* ........................................................12

Pl.'s Mot. Prelim. Inj., *Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (2017) (No. 17-4540)...........................................................................................9

R. Fallon, D. Meltzer, & D. Shapiro, *Hart & Wechsler's The Federal Courts and the Federal System* 290 (5th ed. 2003) ..............................................................20

Rachel K. Jones, *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*, Guttmacher Inst. (Nov. 2011)..............................................6

U.S. Congress, Joint Econ. Comm., *The Economic Benefits of Access to Family Planning* (Oct. 2015) .......................................................................6

U.S. Dep't of Health & Human Servs., Health Res. & Servs. Admin., *Women's Preventive Service Guidelines* (2016) .............................................25

**Regulations**

130 Code Mass. Regs. 450.317.................................................................14

Annual Update of the HHS Poverty Guidelines, 83 Fed. Reg. 2642 (Jan. 18, 2018)...................................................................................12

Coverage of Certain Preventive Services under the Affordable Care Act, 78 Fed. Reg. 39,870 (July 2, 2013)....................................................13

Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) ............................................................... 3, 8, 9

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) ....................................................... 2, 8, 9, 10, 11, 14

**INTEREST OF AMICI CURIAE**

Access to contraception advances educational opportunity, workplace equality, and financial empowerment for women; improves the health of women and children; and reduces healthcare related costs for individuals, families, and states. As a result of the Patient Protection and Affordable Care Act (ACA), women across the country enjoy access to cost-free contraceptive services through their employer-sponsored insurance. The Commonwealths of Pennsylvania and Virginia, the States of California, Connecticut, Delaware, Hawaiʻi, Iowa, Maine, Maryland, Minnesota, New York, North Carolina, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia (the "Amici States") have a compelling interest in protecting the health, well-being, and economic security of their residents and ensuring they enjoy the full scope of rights to which they are entitled under the ACA.

Recognizing the broad socio-economic and health benefits of affordable contraception, Amici States are committed to making contraception widely available and affordable for their residents. For example, Amici states provide access to contraceptive services through state-funded programs and others means. In addition, many states require state-regulated insurance plans to cover contraceptive services, and an increasing number mandate that contraceptive

coverage be cost-free.[1] But because federal law preempts state regulation of self-funded insurance plans, state laws fail to reach tens of millions of residents; many receive access to contraceptive coverage only due to the ACA's contraceptive mandate. For these reasons and others, Amici States have a strong interest in ensuring that the Defendants implement the ACA fully and in ways that promote women's health and equality and do not impose additional costs on the states.[2]

## SUMMARY OF ARGUMENT

Access to affordable contraception is vital for women and families—not just as necessary healthcare, but as a stepping stone to educational and professional achievement, socio-economic autonomy, and economic prosperity. Yet the Defendants' Interim Final Rules (the "Rules") allow employers with religious or moral objections to deny employees and their dependents contraceptive coverage otherwise required under the ACA. Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017); Moral Exemptions and Accommodations for

---

[1] Guttmacher Inst., *Insurance Coverage of Contraceptives* (Sept. 1, 2018), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[2] Several Amici States have already litigated in defense of these interests. *E.g.*, *Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017), *on appeal* No. 18-1253 (3d Cir.); *California v. Health & Human Servs.*, 281 F. Supp. 3d 806 (N.D. Cal. 2017), *on appeal*, No. 18-15255 (9th Cir.).

Coverage of Certain Preventive Services under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017). These Rules violate the Constitution and federal statutes and will cause inevitable and irreparable harm.

Massachusetts has Article III standing to protect itself and its residents. Depriving women of access to cost-free contraception mandated by the ACA will cause women to turn to state-funded programs for contraceptive services. Massachusetts and the Amici States will not only bear these additional costs, but will also bear the costs of increased unplanned pregnancies for those women who will no longer have access to contraception due to the Rules. These increased financial burdens directly harm state proprietary interests and therefore establish Article III standing. In addition, Massachusetts and the Amici States have well-established quasi-sovereign interests in the health and well-being of their citizens and in ensuring they have full and equal enjoyment of federal law. Because the Rules threaten these interests, Massachusetts and the Amici States also have *parens patriae* standing to challenge their legality.

## ARGUMENT

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. At an "irreducible minimum," every plaintiff must allege "(1) an injury that is (2) 'fairly traceable to the defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed

by the requested relief.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992)

(quoting *Allen v. Wright,* 468 U.S. 737, 751 (1984)). To establish a constitutionally

sufficient injury, the plaintiff "must show that he or she suffered 'an invasion of a

legally protected interest' that is 'concrete and particularized' and 'actual or

imminent.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*,

504 U.S. at 560).

The Supreme Court has long recognized that states possess three distinct

types of interests—sovereign, proprietary, and quasi-sovereign—the invasion of

which constitutes a cognizable injury-in-fact. *Alfred L. Snapp & Son, Inc. v. Puerto

Rico, ex rel., Barez*, 458 U.S. 592, 601–02 (1982). A state's sovereign interests

include "the exercise of sovereign power over individuals and entities" within its

borders, such as through the creation and enforcement of a civil criminal legal

code, and "the demand for recognition from other sovereigns," such as through the

"maintenance and recognition of borders." *Id.* at 601. A state's proprietary interests

arise from its own property and business relationships. *Id.* at 601–02. And a state's

quasi-sovereign interests include, at a minimum, those that the state has in "the

well-being of its populace" and in securing full and equal participation in the

federal system. *Id.* at 602, 607–08.

The Rules invade the latter two categories of interests of Amici States: they

will directly injure states' proprietary interests through the increased use of state-

sponsored programs that provide contraceptive and medical services, and they will directly injury states' quasi-sovereign interests through harm to state residents' well-being and denial of state residents' full enjoyment of federal benefits.

## I.   Massachusetts Has Article III Standing Because Its Proprietary Interests Will Be Irreparably Harmed by the Rules.

### A.   Access to Affordable Contraception is Vital to Women's Health and Economic Opportunity.

Access to affordable contraception is vital to the health and economic well-being of women and their families. Millions of women need contraception, including more than 24 million women in Massachusetts and Amici States.[3] They rely on contraception for birth control, general health, and economic opportunity.

Contraception reduces the risk of unintended pregnancies, adverse pregnancy outcomes, and health risks associated with pregnancy.[4] Indeed, for some women, pregnancy can be life-threatening.[5] But contraception is not only used for birth control. It is frequently prescribed to treat menstrual disorders, acne, pelvic pain and other medical conditions. Long-term use of oral contraceptives reduces a

---

[3] Jennifer J. Frost et al., *Contraceptive Needs and Services, 2014 Update*, at 23, Guttmacher Inst. (Sept. 2016), https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[4] *See* Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, at 103–07 (2011), https://cdn.cnsnews.com/documents/IOM-CLINICAL%20PREVENTIVE%20SERVICES%20FOR%20WOMEN.pdf.

[5] *Id.*

woman's risk of endometrial cancer and protects against pelvic inflammatory disease and some benign breast diseases.[6] In fact, more than half of all women who use contraception use it to manage health issues unrelated to birth control.[7]

Nor are the benefits of contraception limited to healthcare. Contraception enables women to better plan their families by timing and spacing their own pregnancies, participate fully in the workforce, and exercise greater control over their lives and health. Access to contraception increases the number of women who obtain a college education, pursue advanced degrees, and participate in the paid labor force.[8] This, in turn, boosts women's earning power, decreases the gender pay gap, strengthens women's economic stability, and reduces poverty.[9]

Overwhelming empirical evidence shows that improving access to affordable contraception significantly benefits states' economies: every taxpayer

---

[6] *Id.*

[7] See Rachel K. Jones, *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*, Guttmacher Inst. (Nov. 2011), https://www.guttmacher .org/sites/default/files/report_pdf/beyond-birth-control.pdf.

[8] Adam Sonfield et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children* 7–17, Guttmacher Inst. (Mar. 2013), https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf; U.S. Cong., Joint Econ. Comm., *The Economic Benefits of Access to Family Planning* (Oct. 2015), https://www.jec.senate.gov/public/index .cfm/democrats/2015/10/the-economic-benefits-of-access-to-family-planning.

[9] Sonfield et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*, supra note 8; Joint Econ. Comm., *The Economic Benefits of Access to Family Planning*, supra note 8.

dollar invested in family planning saves about seven.[10] These benefits are

maximized by providing a range of contraceptive options without cost, which

empowers women to choose and consistently use more effective, reliable forms of

contraception.[11]

    Recognizing these benefits, 28 states and the District of Columbia have

adopted laws that require health plans to provide contraceptive coverage.[12] Twelve

of them have ACA-style regulations that currently or prospectively mandate

coverage at no cost.[13] The Employee Retirement Income Security Act (ERISA),

however, preempts application of these state laws to the most widespread

employer-sponsored health plans: self-funded plans. *See* 29 U.S.C. § 1144(a),

(b)(2)(A); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740–47

(1985).

---

[10] Joint Econ. Comm., *The Economic Benefits of Access to Family Planning*, *supra* note 8; *see also* Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, *supra* note 4, at 107–08.

[11] Guttmacher Inst., *Improving Contraceptive Use in the United States*, at 4–5 (May 2008), https://www.guttmacher.org/sites/default/files/report_pdf/improvingcontraceptiveuse_0.pdf; Laurie Sobel et al., *The Future of Contraceptive Coverage*, at 4, Henry J. Kaiser Family Found. (Jan. 2017), http://files.kff.org/attachment/Issue-Brief-The-Future-of-Contraceptive-Coverage.

[12] Guttmacher Inst., *Insurance Coverage of Contraceptives*, *supra* note 1.

[13] *Id.*

Approximately 61% of covered workers are enrolled in self-funded plans.[14] Women with these plans cannot benefit from state laws meant to ensure access to effective and affordable contraception. Instead, they must depend on the Women's Health Amendment to the ACA for guaranteed contraceptive coverage—coverage that the Rules now seek to erase.

### B.     The Rules Will Cause Women to Lose Contraceptive Coverage, Causing Them and Amici States Irreparable Harm.

If allowed to go into effect, the Rules will cause hundreds of thousands of women and their dependents to lose medical coverage guaranteed by the ACA. *See* 82 Fed. Reg. at 47,815–24; 82 Fed. Reg. at 47,856–58. Indeed, that is the purpose of the Rules: to allow employers to refuse to provide their employees with contraceptive coverage to which they are otherwise legally entitled.

The loss of coverage will cause direct and irreparable financial harm to the states. They will face increased costs from providing contraceptive care services through already over-burdened state programs. And, where women do not seek or can no longer get contraceptive care, state programs will face additional costs from unintended pregnancies and potentially life-threatening medical consequences that may result.

---

[14] *See* Henry J. Kaiser Family Found., *2016 Employer Benefits Survey* § 10 (Sept. 2016), https://www.kff.org/reportsection/ehbs-2016-section-ten-plan-funding/.

For Massachusetts, Amici States, their female citizens, and their families, the harms caused by the Rules are both concrete and irreparable.

### 1. The Rules Will Cause Hundreds of Thousands of Women to Lose Employer-Sponsored Contraceptive Coverage.

Defendants' own regulatory impact analysis conservatively calculated that between 31,715 and 120,000 women will lose their employer-sponsored contraceptive coverage due to the Rules. *See* 82 Fed. Reg. at 47,815–24; 82 Fed. Reg. 47,856–58.[15] The assumptions underlying Defendants' analysis are highly questionable, however, and the true number of women who will immediately lose access to contraceptive coverage may be much higher. *See* Pl.'s Mot. Prelim. Inj. at 40–42, *Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (2017) (No. 17-4540). Even so, these figures only offer a snapshot of the Rules' direct and immediate effect. Cumulatively, many more women and their families will be affected over time.

Many of the women who will lose contraceptive coverage under the Rules work for employers with self-funded plans that are exempt from state regulation due to ERISA preemption. *See* 82 Fed. Reg. at 47,820–21. Nationally, these self-

---

[15] Defendants calculated the lower estimate using information about employers who have objected to providing contraceptive coverage under the ACA, either through litigation or by using the ACA's existing accommodation. 82 Fed. Reg. at 47,815–21. Defendants calculated the upper estimate using the fraction of employers that excluded contraceptive coverage from their health plans before the ACA went into effect. *See id.* at 47,821–24.

funded plans cover 61% of people with employer-sponsored insurance.[16] This is reflected in the Defendants' regulatory impact analysis: fewer than one-third of the women included in the lower estimate are identified as working for employers with health plans subject to state laws requiring contraceptive coverage,[17] and the upper estimate already effectively excludes women who work for such employers.[18] *See* 82 Fed. Reg. at 47,820–22.

Consistent with these facts, the administrative record identifies multiple litigating employers that Defendants expect will use the exemptions and that are located in Massachusetts and Amici States, including DAS Companies Inc., Hobby Lobby Stores Inc., Global Pump Co., J.E. Dunn Construction Group Inc., Media Research Center, Mersino Dewatering, and Trijicon, Inc. J.A. 1348–79. Each has objected to providing contraceptive coverage under the ACA and none is subject to state laws requiring such coverage: They are either located in states without such laws or use plans subject to ERISA preemption. *See id.* Defendants have no

---

[16] *See* Henry J. Kaiser Family Found., *2016 Employer Benefits Survey*, *supra* note 14.

[17] The Defendants' regulatory impact analysis provides insurance plan information only for accommodated employers. Including litigating employers would likely increase the proportion of women who have fully-insured plans.

[18] The upper estimate is based on data concerning employers who excluded contraceptive coverage from their health plans in 2010. *See* 82 Fed. Reg. at 47,822 & n.87. Employers required to provide coverage under state laws in effect prior to the passage of the ACA are necessarily excluded from this estimate.

information about additional employers that will use the exemptions, *see* 82 Fed. Reg. at 47,815–21, but these companies alone employ tens of thousands of people across the country, including in Massachusetts and Amici States. *See* J.A. 1348– 79.

### 2. States Will Bear the Costs of Providing Contraceptive Coverage to Women Who Lose It.

Defendants admit that many women who lose contraceptive coverage under the Rules will obtain replacement care and services through state-funded programs. *See, e.g.*, 82 Fed. Reg. at 47,803. Defendants estimate the direct cost of providing replacement care and services at between $18.5 and $63.8 million annually. *See* 82 Fed. Reg. at 47,821, 47,823–24. States will bear a significant share of this cost.

Among Massachusetts and Amici States, eligibility limits for state-sponsored programs that provide contraceptive care—including Medicaid, Medicaid Family Planning Expansion, Title X clinics, and State Family Planning—extend up to 300% of the Federal Poverty Level (FPL) (and in limited circumstances beyond), with many such programs having limits in the range of 200% to 250% of FPL.[19] Pennsylvania's Family Planning Services program, for

---

[19] Guttmacher Inst., *Publicly Funded Family Planning Services in the United States* (Sept. 2016), https://www.guttmacher.org/sites/default/files/factsheet/ fb_contraceptive_serv_0.pdf; uttmacher Inst., *Medicaid Family Planning Eligibility Expansions* (Sept. 1, 2018), https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions. Several States

example, provides preventive screening and contraceptive services to individuals and families with incomes up to 220% of the FPL.[20] For 2018, many women earning more than $40,000 per year and some women earning over $70,000 may be eligible for contraceptive coverage under state programs. Coverage through an employer typically does not render women ineligible for state-funded services that the employer-sponsored insurance does not provide.[21]

Many women denied contraceptive coverage by their employers under the Rules will remain income-eligible for coverage under state programs. *See* Exhibit A.[22] For Massachusetts and Amici States this includes 4,988,685 income-eligible women, with 3,032,023 in self-funded plans. Several states will actually be

---

offer coverage at or above 300% FPL for groups such as children up to age of 19 or individuals with disabilities.

[20] Guttmacher Inst., *Medicaid Family Planning Eligibility Expansions*, *supra* note 19; *see* Pa. Dep't of Human Servs., *Family Planning*, http://www.dhs.pa.gov/ citizens/reproductivehealth/familyplanning/index.htm (last visited Sept. 18, 2018). The 2018 FPL is set at $20,780 for a family of three, $25,100 for a family of four, and higher for larger families. *See* Annual Update of the HHS Poverty Guidelines, 83 Fed. Reg. 2642, 2643 (Jan. 18, 2018).

[21] *E.g.*, Pa. Dep't of Human Servs., *Family Planning*, *supra* note 20.

[22] This Exhibit was originally presented in Brief of Massachusetts, Connecticut, District of Columbia, Hawaiʻi, Illinois, Iowa, Maine, Minnesota, North Carolina, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington as Amici Curiae Supporting Appellees, California et al. v. Azar et al. (9th Cir. No. 18-15255).

required to fund coverage under existing Medicaid programs.[23] At least 1,333,348 women across eleven states will be eligible to receive such services from state Medicaid, with 954,628 in self-funded plans.[24]

Where employers refuse to provide coverage for contraceptive care under the Rules, states will end up paying the cost as more women turn to state programs.

### 3. States Will Bear Increased Costs from Unintended Pregnancies and Complications When Women Cannot Get Coverage.

While states will pay to mitigate some negative effects of the Rules, many women will not be able to get replacement coverage. As Defendants have repeatedly acknowledged, there is no effective substitute for the ACA's seamless, no-cost coverage. *See, e.g.*, Coverage of Certain Preventive Services under the Affordable Care Act, 78 Fed. Reg. 39,870, 39,888 (July 2, 2013). When women lose coverage due to the Rules, states will be forced to bear additional costs from

---

[23] State Medicaid programs can and do serve as secondary payers for eligible individuals even if they have other forms of insurance.

[24] The same criteria were used with the FPL shifted to the basic Medicaid income threshold (138% FPL). Twenty-five states, including California, Maryland, New York, Pennsylvania, and Virginia, have extended Medicaid eligibility for family planning services above this income threshold. *See* Guttmacher Inst., *Medicaid Family Planning Eligibility Expansions*, *supra* note 19. As a result, this figure likely understates the number of eligible women.

the increase in unintended pregnancies and other negative health outcomes to women and children caused by reduced access to contraception.[25]

States already spend billions of dollars annually on unintended pregnancies.[26] For instance, in 2010, government-funded programs paid the costs associated with 68% of births resulting from unplanned pregnancies; for planned pregnancies, the figure was just 38%.[27] The fact that women who lose contraceptive coverage under the Rules will retain the balance of their coverage under employer-sponsored plans will not insulate states from harm. Increased health care costs will be passed on to the states through Medicaid and other state-funded programs that provide wrap-around coverage and reimbursement for deductibles, co-insurance, emergency care and other amounts and services not covered by primary insurance.[28]

---

[25] Defendants acknowledge that a "noteworthy" potential effect of the Rules will be an increase in spending on "pregnancy-related medical services." 82 Fed. Reg. at 47,827–28 & n.113.

[26] Adam Sonfield & Kathryn Kost, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, Guttmacher Inst. (Feb. 2015), https://www.guttmacher.org/sites/default/files/report_pdf/public-costs-of-up-2010.pdf.

[27] *Id.*

[28] *See, e.g.*, 130 Code Mass. Regs. 450.317 (MassHealth's wrap-around insurance regulations).

* * *

By allowing employers to evade their obligations under the ACA, the Rules will negatively impact the health, autonomy, and socio-economic equality of women in Massachusetts, Amici States, and throughout the country. And Massachusetts and Amici States will bear increased costs associated with contraceptive services, unplanned pregnancies, and the negative health outcomes for those forced to go without. These harms, directly attributable to the Rules and redressible by the Court through injunctive relief, give Massachusetts Article III standing. *See Spokeo*, 136 S. Ct. at 1548; *Lujan*, 504 U.S. at 590.

## II. Massachusetts Has *Parens Patriae* Standing Because the Rules Will Injure the Commonwealth's Quasi-Sovereign Interests.

In addition to the Commonwealth's proprietary interests, the Rules threaten its quasi-sovereign interests in the general "well-being of its populace" and in "ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Snapp*, 458 U.S. at 602, 608. This invasion of its quasi-sovereign interests give Massachusetts standing under the *parens patriae* doctrine.

### A. Massachusetts Has the Right to Protect Its Quasi-Sovereign Interests.

The *parens patriae* doctrine is an inherent feature of state sovereignty dating back to the English constitutional system. *Hawai'i v. Standard Oil Co. of Cal.*, 405

U.S. 251, 257 (1972). Translated literally, *parens patriae* means "parent of his or her country." Black's Law Dictionary (10th ed. 2014). In England, the King had power as *parens patriae* to protect "persons under legal disabilities to act for themselves." *Hawai'i*, 405 U.S. at 257.[29] When the United States achieved independence, "the prerogatives of the crown devolved upon the people of the States." *Fontain v. Ravenel*, 58 U.S. 369, 384 (1854). "The State, as a sovereign" became the "*parens patriae*" of its citizenry. *Id.*; *see Hawai'i*, 405 U.S. at 257. But as the Supreme Court has recognized, the English definition of *parens patriae* has "relatively little to do with the concept of *parens patriae* standing that has developed in American law." *Snapp*, 458 U.S. at 600. Over more than a century, the English doctrine of *parens patriae* has both expanded and shifted, giving a state the right "to sue as *parens patriae* to prevent or repair harm to its 'quasi-sovereign' interests." *Hawai'i*, 405 U.S. at 257–58; *see Snapp*, 458 U.S. at 600–01; *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 335 (1st Cir. 2000).

### 1. The Modern Doctrine of *Parens Patriae* Standing Allows States to Protect Their Quasi-Sovereign Interests.

The Supreme Court first recognized *parens patriae* standing in *Louisiana v. Texas*, 176 U.S. 1 (1900). There, a quarantine imposed by a Texas health officer

---

[29] As Blackstone observed, this included serving "as 'the general guardian of all infants, idiots, and lunatics,' and as the superintendent of 'all charitable uses in the kingdom.'" *Id.* (quoting 3 William Blackstone, Commentaries *47).

negatively impacted commerce in Louisiana. *Id.* at 4, 8–10. Although the Court dismissed the lawsuit for want of a controversy between the states, it recognized that Louisiana "present[ed] herself in the attitude of *parens patrioe* [*sic*], trustee, guardian, or representative of all her citizens." *Id.* at 19. A year later, the Supreme Court held that Missouri could sue as *parens patriae* to enjoin the discharge of sewage into the Mississippi river, finding that "if the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them." *Missouri v. Illinois*, 180 U.S. 208, 241 (1901).

Six years later, the Court first linked *parens patriae* to the protection of a state's quasi-sovereign interests. *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237–38 (1907). Georgia sued to enjoin private copper companies in Tennessee from discharging noxious gases. *Id.* at 236. Describing the suit as one "by a state for an injury to it in its capacity of quasi-sovereign," Justice Holmes observed that "[i]n that capacity the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." *Id.* at 237. In a separate suit decided the same day addressing Colorado's diversion of water from the Arkansas River, the Court allowed Kansas to sue as *parens patriae* to enjoin injury to the "health and comfort" of its citizens, which affected "the general welfare of the state." *Kansas v. Colorado*, 206 U.S. 46, 99 (1907).

Over the following decades, the Supreme Court repeatedly reaffirmed the states' right to sue as *parens patriae* to defend their quasi-sovereign interests in the health, welfare, and economic well-being of their citizens.[30] Then, in 1982, the Supreme Court provided its clearest articulation of the modern *parens patriae* doctrine in *Snapp*. 458 U.S. at 600–08. In that case, Puerto Rico brought a *parens patriae* suit against east coast apple growers for discriminating against Puerto Rican workers and violating a federal employment service scheme established by two federal statutes. *Id.* at 597–98, 608. Distilling eighty years of case law, the Court held that to bring a claim as *parens patriae*, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party." *Id.* at 607. While it declined to articulate a "definitive list," the Court recognized two well-established "general categories" of quasi-

---

[30] *E.g.*, *New York v. New Jersey*, 256 U.S. 296, 301–02 (1921) (allowing suit to enjoin discharge of sewage into New York harbor because "health, comfort and prosperity of the people of the state and the value of their property being gravely menaced, . . . the state is the proper party to represent and defend such rights"); *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923) (allowing Pennsylvania to challenge restraint on commercial flow of natural gas because, "as the representative of the public," Pennsylvania had "an interest apart from that of the individuals affected" that was "immediate and recognized by law"); *North Dakota v. Minnesota*, 263 U.S. 365, 373–74 (1923) (finding Minnesota had "such an interest as quasi sovereign in the comfort, health, and prosperity of her farm owners that resort may be had to this court for relief"); *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 443, 445–52 (1945) (allowing Georgia to sue "[i]n her capacity as a quasi-sovereign or as agent and protector of her people against a continuing wrong done to them" by alleged price-fixing of several railroad companies).

sovereign state interests: protecting the general well-being of state residents and preserving its full and equal participation in the federal system. *Id.*

First, every state "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id.* A defendant's behavior invades this interest when it affects—directly and indirectly—some "sufficiently substantial segment of its population." *Id.* The Court declined to "draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior." *Id.* But it did note that a "helpful indication" of sufficient injury is whether "the State, if it could, would likely attempt to address [the injury] through its sovereign lawmaking powers." In other words, a state likely has *parens patriae* standing to protect the well-being of its residents if it would address the complained-of injury under state law but for some external impediment, such as federal preemption. *See id.*

Second, every state has a quasi-sovereign interest in "securing observance of the terms under which it participates in the federal system." *Id.* at 607–08. This interest is "distinct from" its interest in its residents' general well-being. *Id.* Pursuant to this second interest, a state can enforce "federal statutes that creat[e] benefits [for] or alleviat[e] hardships" of their residents. *Id.* at 608 (citing *Georgia v. Pa. R.R. Co.*, 324 U.S. 439). A state can also ensure that its residents have equal enjoyment of fundamental constitutional rights, such as participation "in the free

flow of commerce" guaranteed by the Commerce Clause. *Id.* (citing *Pennsylvania v. West Virginia*, 262 U.S. 553).

Applying these principles, the *Snapp* Court found that Puerto Rico had properly alleged injuries in both categories. *Id.* at 608–10. Puerto Rico had *parens patriae* standing due to its interest in "the health and well-being of its residents"— which extended to "securing residents from the harmful effects of discrimination." *Id.* at 609. And it separately had *parens patriae* standing to pursue "full and equal participation in the federal employment service scheme" established by federal statute. *Id.* at 609–10.

Only a decade ago, the Supreme Court reaffirmed a state's standing to protect its quasi-sovereign interests. *Massachusetts v. EPA*, 549 U.S. 497, 518–26 (2007).[31] There, Massachusetts sought to challenge the EPA's refusal to regulate greenhouse gases as required by the Clean Air Act. *Id.* at 514. The Court held that "the special position and interest of Massachusetts" as a "sovereign State" was of

---

[31] Whether the holding of *Massachusetts v. EPA* ultimately rested on *parens patriae* standing is open to debate. The Court identified a legally sufficient injury in the Commonwealth's ownership of coastal property, *id.* at 522, but supported its holding by referencing a state's well-established right to bring a *parens patriae* suit, *id.* at 519–20 & n.17 (citing R. Fallon, D. Meltzer, & D. Shapiro, *Hart & Wechsler's The Federal Courts and the Federal System* 290 (5th ed. 2003)). This Court need not decide the precise holding of that case, however, because it nevertheless supports the proposition that states do have the right to bring *parens patriae* suits to protect their quasi-sovereign interests. *See id.*

"considerable relevance," entitling it to "special solicitude in our standing analysis." *Id.* at 515, 520.

Indeed, the Court has repeatedly recognized that the state's special right to *parens patriae* standing comes in part from its unique position as a "sovereign State" in a federal system. *Id.* at 518. If each state were still fully "independent and sovereign," it could "seek a remedy by negotiation, and, that failing, by force." *Missouri v. Illinois*, 180 U.S. at 241. But upon joining the Union, each state surrendered "certain sovereign prerogatives." *Massachusetts v. EPA*, 549 U.S. at 519. A state cannot "invade," or "negotiate a [] treaty with," another state or federal agency to ensure its compliance with federal law. *Id.* Yet the states "did not renounce the possibility of making reasonable demands on the ground of their still remaining quasi-sovereign interests." *Georgia v. Tenn. Copper Co.*, 26 U.S. at 237. "[T]he alternative to force," the Court has observed, "is a suit." *Id.*

In sum, a state has the right to bring a *parens patriae* suit to protect its quasi-sovereign interests and—as with all suits brought by states—is entitled to "special solicitude" when it does so. *Massachusetts v. EPA*, 549 U.S. at 520; *Snapp*, 458 U.S. at 600–08. To satisfy Article III, "the State must articulate an interest apart from the interests of particular private parties," the invasion of which is caused by the defendant and redressible by the court. *See Snapp*, 458 U.S. at 607; *see also Spokeo*, 136 S. Ct. at 1548; *Lujan*, 504 U.S. at 590. Two well-established quasi-

sovereign interests are the general health and well-being of the state's residents, which includes the state's interest in protecting them from discrimination, and the state's full and equal participation in the federal system, which includes equal enjoyment of federal laws and constitutional rights. *See Snapp*, 458 U.S. at 607–08; *Georgia v. Pa. R.R. Co.*, 324 U.S. at 445–52; *Pennsylvania v. West Virginia*, 262 U.S. at 592. A state alleging that the defendant injured either of these interests in a way redressible by a court has therefore met the "irreducible minimum" of Article III. *Lujan*, 504 U.S. at 590.

### 2. Massachusetts Has a Right to Bring a *Parens Patriae* Suit to Protect Its Quasi-Sovereign Interests.

Massachusetts alleges four counts based in the APA: failure to conduct notice and comment rulemaking, promulgation of the Rules in contravention of the ACA and other federal laws, violation of the Establishment Clause, and violation of the equal protection guarantee of the Fifth Amendment.[32] J.A. 31–35. In light of Massachusetts' position in our federal system, filing a lawsuit is the Commonwealth's only recourse to force defendants to comply with federal statutory and constitutional law. *See Massachusetts v. EPA*, 549 U.S. at 519;

---

[32] The APA creates a cause of action to challenge agency actions as being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706.

*Georgia v. Tenn. Copper Co.*, 26 U.S. at 237; *Missouri v. Illinois*, 180 U.S. at 241. And because Massachusetts seeks, in its suit, to defend its quasi-sovereign interests, it has *parens patriae* standing to assert all four claims.

Massachusetts' quasi-sovereign interests fit within both recognized "general categories." First, Massachusetts has a well-established quasi-sovereign interest in "the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607. As set forth above, access to cost-free contraception is critical to women's health, education, professional achievement, economic stability, and social equality. By causing women in Massachusetts to lose cost-free contraceptive coverage, the Rules will cause both direct and indirect injuries to the physical and the economic well-being of its residents. Massachusetts has also alleged that the Rules discriminate against women in violation of the equal protection guarantee of the Fifth Amendment, the ACA, and Title VII. *See* J.A. 33–35. As in *Snapp*, Massachusetts' quasi-sovereign interest extends to "securing residents from the harmful effects of discrimination." 458 U.S. at 609.

Moreover, Massachusetts has tried to remedy the injuries caused by the Rules but cannot fully do so due to ERISA preemption. Soon after the Defendants issued the Rules, Massachusetts adopted the Advancing Contraceptive Coverage and Economic Security in our State (ACCESS) Act. 2017 Mass. Acts ch. 120; Carey Goldberg, *Countering Trump, Mass. Swiftly Passes New Law Ensuring*

*Access To No-Cost Birth Control*, WBUR (Nov. 20, 2017).[33] This Act ensures cost-free contraceptive coverage for certain employer-sponsored health plans—but, due to ERISA, it cannot help the approximately 56% of Massachusetts residents who receive private commercial health insurance through self-insured plans. *See* J.A. 454; 29 U.S.C. § 1144(a), (b)(2)(A); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740–47 (1985). According to Supreme Court precedent, Massachusetts' attempted use of "sovereign lawmaking powers" to remedy its injury is a "helpful indication" that the injury "suffices to give the [Commonwealth] standing to sue as *parens patriae*." *Snapp*, 458 U.S. at 607; *see Massachusetts v. EPA*, 549 U.S. at 519.

Second, Massachusetts has a well-established quasi-sovereign interest in ensuring that the benefits of federal law accrue to its residents. *Snapp*, 458 U.S. at 608. As a result of the Women's Health Amendment to the ACA, employers in Massachusetts (and, indeed, across the United States) must provide women no-cost coverage for all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling. 42 U.S.C. § 300gg-13(a)(4); U.S. Dep't of Health & Human Servs., Health Res. & Servs. Admin., *Women's Preventive*

---

[33] http://www.wbur.org/commonhealth/2017/11/20/mass-birth-control-access-law.

*Service Guidelines* (2016).[34] The Rules will deny Massachusetts residents their benefits under the ACA. The APA also mandates that all rules go through notice and comment rulemaking to allow public comment, and requires all agency action to be in accordance with the law, the Constitution, and the agency's statutory authority. 5 U.S.C. § 553(b), (c); 5 U.S.C. § 706. The Rules did not go through notice and comment, nor do they comply with the Constitution's requirement of equal protection or with the Establishment Clause. As a result, Massachusetts can sue as *parens patriae* to enforce these "federal statutes [that] creat[e] benefits" for its residents, *Snapp*, 458 U.S. at 608 (citing *Georgia v. Pa. R.R. Co.*, 324 U.S. at 445–52), and to ensure that its residents have equal enjoyment of fundamental constitutional rights, *see id.* (citing *Pennsylvania v. West Virginia*, 262 U.S. at 582, 592 (allowing Pennsylvania *parens patriae* standing to protect residents from Commerce Clause violation)).

Because Massachusetts has articulated the invasion of two quasi-sovereign interests, it has suffered legally cognizable injuries in fact. *See Snapp*, 458 U.S. at 607–08; *see also Spokeo*, 136 S. Ct. at 1548; *Lujan*, 504 U.S. at 590. Because the Defendants have caused these injuries by promulgating the Rules, and because the Court can order injunctive relief that remedies the Commonwealth's injuries,

---

[34] https://www.hrsa.gov/womens-guidelines-2016/index.html.

Massachusetts has Article III standing as *parens patriae*. *See Snapp*, 458 U.S. at 607; *see also Spokeo*, 136 S. Ct. at 1548; *Lujan*, 504 U.S. at 590.

### B. Prudential Limitations on *Parens Patriae* Standing Do Not Bar Massachusetts' Suit.

Although, as here, an invasion of a state's quasi-sovereign interests satisfies Article III, *Lujan*, 504 U.S. at 590, the Supreme Court has suggested several narrow limitations on a state's exercise of its *parens patriae* standing. The Court has indicated that a state cannot ordinarily bring a *parens patriae* suit to "protect her citizens from the operation of federal statutes." *Massachusetts v. EPA*, 549 U.S. at 520 n.17 (quoting *Georgia v. Pa. R.R. Co.*, 324 U.S. at 447); *accord Massachusetts v. Mellon*, 262 U.S. 447, 484–86 (1923). It has also observed that a state cannot ordinarily bring a *parens patriae* suit to "question [the] distribution of powers between the State and the national government." *Georgia v. Pa. R.R. Co.*, 324 U.S. at 445–46 (citing *Mellon*, 262 U.S. 447). Massachusetts' suit implicates neither scenario.

These limitations are not grounded in Article III, which focuses on "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (internal quotation marks omitted). As established above, Massachusetts

satisfies this "minimum constitutional mandate" through the injury to its quasi-sovereign interests. *Id.* at 499. Instead, these limitations are best characterized as "prudential." *Id.* at 498 (recognizing that standing has both constitutional and prudential limitations); *see Massachusetts v. EPA*, 549 U.S. at 539–40 & n.1 (Roberts, C.J., dissenting) (referring to state's inability to bring a *parens patriae* suit against a federal statute as a "prudential requirement"); *Md. People's Counsel v. FERC*, 760 F.2d 318, 321–22 (D.C. Cir. 1985) (Scalia, J.) (holding that *Mellon* imposed prudential limitation on state *parens patriae* standing); *Challenge v. Moniz*, 218 F. Supp. 3d 1171, 1177–78 (E.D. Wash. 2016) (holding that *Mellon* is a "prudential standing limit").

Both limitations arise from *Mellon*, a case in which Massachusetts challenged the constitutionality of the Maternity Act,[35] claiming that "Congress ha[d] usurped the reserved powers of the several states." 262 U.S. at 483. The Supreme Court declined to exercise jurisdiction for two reasons. First, Massachusetts had presented a question that was "political, and not judicial in character" and so was "not a matter which admits of the exercise of the judicial power." *Id.* at 483. The Court distinguished such a nonjusticiable political question

---

[35] The Maternity Act distributed money to states that complied with certain federal provisions aimed at reducing maternal and infant mortality and protecting the health of mothers and infants. *Mellon*, 262 U.S. at 497.

from one involving "rights of person or property," "rights of dominion over physical domain," and "*quasi sovereign rights actually invaded or threatened*," which are judiciable. *See id.* at 484–85 (emphasis added); *see Massachusetts v. EPA*, 549 U.S. at 520 n.17 (noting this language indicated *Mellon* did not sweep broadly). Second, the Supreme Court held that, under the facts in *Mellon*, "a state, as parens patriae, may [not] institute judicial proceedings to protect citizens of the United States from the operation of [U.S.] statutes." *Mellon*, 262 U.S. at 485. There, "it is the United States, and not the [individual] state, which represents them as parens patriae." *Id.* at 486. The *Mellon* Court was quick to limit its own holding, however: it "need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress," only that it was "clear that the right to do so does not arise here." *Id.* at 485.[36]

But these prudential limitations do not prevent a state from bringing a *parens patriae* suit against a federal agency "to assert its rights under federal law."

---

[36] A footnote in *Snapp* observed that a "State does not have standing as *parens patriae* to bring an action against the Federal Government." 458 U.S. at 610 n.16 (citing *Mellon*, 262 U.S. at 485–86). In the same footnote, the Court observed: "[h]ere, however, the Commonwealth is seeking to secure the federally created interests of its residents against private defendants." *Id.* Therefore, the *Snapp* Court could not—and so did not—decide whether and to what extent a State could bring a *parens patriae* suit against the federal government. *See also Massachusetts v. EPA*, 549 U.S. at 520 n.17.

*Massachusetts v. EPA*, 549 U.S. at 520 n.17. As a result, Massachusetts had standing to challenge the EPA for violating the Clean Air Act by refusing to regulate greenhouse gas emissions. *Id.* at 517–26 & n.17. The Court recognized that Massachusetts did not "dispute that the Clean Air Act *applie*[*d*] to its citizens; it rather [sought] to assert its rights under the Act." *Id.* at 520 n.17.

Likewise, here, Massachusetts may assert its rights under APA and the ACA to protect its residents from the harmful effects of the Rules. Unlike in *Mellon*, Massachusetts does not seek to "protect her citizens from the operation of federal statutes." *See Massachusetts v. EPA*, 549 U.S. at 520 n.17 (quoting *Georgia v. Pa. R.R. Co.*, 324 U.S. at 447); *accord Mellon*, 262 U.S. at 485. Nor does Massachusetts "question [the] distribution of powers between the State and the national government." *Georgia v. Pa. R.R. Co.*, 324 U.S. at 445–46 (citing *Mellon*, 262 U.S. at 447). To the contrary, Massachusetts seeks to *enforce* existing federal statutes—specifically, the APA and the ACA—in the same way it was allowed to enforce the Clean Air Act over a decade ago. *Massachusetts v. EPA*, 549 U.S. at 520 n.17.

As set forth above, all four counts brought by Massachusetts proceed under the APA, which allows a claim to challenge agency action that is "not in accordance with law" or "contrary to [a] constitutional right, power, privilege, or

immunity." 5 U.S.C. § 706(2); J.A. 31–35.[37] Massachusetts alleges that the Rules violate the APA, the ACA and two constitutional rights. It does not allege that the Rules have usurped any state power, nor that the ACA or APA are unconstitutional. Because Massachusetts seeks only to ensure that a federal agency complies with a duly-enacted law of Congress, no prudential limitation bars its assertion of *parens patriae* standing here.

---

[37] The APA creates this cause of action for any "person" who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Massachusetts is a "'person' entitled to enforce" the APA. *E.g.*, *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) (allowing states to sue under APA), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016).

## CONCLUSION

For these reasons, this Court should find that Massachusetts has Article III and should reverse the decision of the district court.

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

 /s/ Michael J. Fischer
Jonathan Scott Goldman
*Executive Deputy Attorney General*
Michael J. Fischer
*Chief Deputy Attorney General*
Aimee D. Thomson
*Deputy Attorney General*
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171
mfischer@attorneygeneral.gov

Date: September 24, 2018

(Additional Counsel Listed on Next Page)

## ADDITIONAL COUNSEL

XAVIER BECERRA
Attorney General of California
1300 I Street
Sacramento, CA 95814

GEORGE JEPSEN
Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106

MATTHEW P. DENN
Attorney General of Delaware
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
Attorney General for the District of Columbia
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001

RUSSELL A. SUZUKI
Attorney General of Hawaiʻi
425 Queen Street
Honolulu, HI 96813

THOMAS J. MILLER
Attorney General of Iowa
Hoover Building
Des Moines, IA 50319

JANET T. MILLS
Attorney General of Maine
State House Station 6
Cross Office Building
Augusta, ME 04333

BRIAN E. FROSH
Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202

LORI SWANSON
Attorney General of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

BARBARA D. UNDERWOOD
Attorney General of New York
28 Liberty Street
New York, NY 10005

JOSHUA H. STEIN
Attorney General of North Carolina
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street N.E.
Salem, OR 97301

PETER F. KILMARTIN
Attorney General of Rhode Island
150 S. Main Street
Providence, RI 02903

THOMAS J. DONOVAN, Jr.
Attorney General of Vermont
109 State Street
Montpelier, VT 05609-1001

MARK R. HERRING
Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219

ROBERT W. FERGUSON
Attorney General of Washington
P.O. Box 40100
Olympia, WA 98504-0100

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a 14-point proportionally spaced serif font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,617 words excluding the parts of the brief exempted under Rule 32(f).

/s/ Michael J. Fischer
Michael J. Fischer, Bar No. 1185506
*Chief Deputy Attorney General*

Dated: September 24, 2018

# CERTIFICATE OF SERVICE

I certify that on September 24, 2018, I electronically filed the foregoing

document with the Clerk of the Court of the United States Court of Appeals for the

First Circuit by using the appellate CM/ECF system. I certify that all participants

in this case are registered CM/ECF users and that service will be accomplished by

the appellate CM/ECF system.

/s/ Michael J. Fischer
Michael J. Fischer, Bar No. 1185506
*Chief Deputy Attorney General*

Dated: September 24, 2018

# EXHIBIT A

Table 1

**Number of Women with Employer-Sponsored Insurance Who Are Income-Eligible for State-Funded Contraceptive Coverage[1]**

| State | Insured, Income-Eligible Women Between the Ages of 15 and 45[2] | Percent of Enrollees Covered Under a Self-Funded Plan[3] | Insured, Income-Eligible Women Between the Ages of 15 and 45 in Self-Funded Plans[4] |
|---|---|---|---|
| California | 1,415,247 | 41.6% | 588,743 |
| Connecticut | 151,198 | 59.3% | 89,660 |
| Delaware | 45,491 | 68.3% | 31,070 |
| Hawaiʻi | 88,650 | 37.6% | 33,332 |
| Iowa | 221,138 | 57.4% | 126,933 |
| Maryland | 277,509 | 49.6% | 137,644 |
| Massachusetts | 365,762 | 56.6% | 207,021 |
| Minnesota | 183,765 | N/A | 183,765 |
| New York | 811,392 | 53.9% | 437,340 |
| Oregon | 188,570 | 53.7% | 101,262 |
| Pennsylvania | 580,295 | N/A | 580,295 |
| Vermont | 23,575 | 60.2% | 14,192 |
| Virginia | 318,424 | N/A | 318,424 |
| Washington | 317,669 | 57.4% | 182,342 |
| **Total** | **4,988,685** | | **3,032,023** |

[1] These numbers are derived from the Interactive Public Use Microdata Series (https://usa.ipums.org/usa/) which provides detailed data from the U.S. Census Bureau's American Community Survey (2015), the State Health Access Data Assistance Center, and the Agency for Healthcare Research and Quality. Each person is assigned to a household health insurance unit (HIU). The incomes of all members of the same HIU are summed and divided by the FPL for the relevant household size to generate the income of the HIU as a percentage of the FPL. For Column 2, the number reflects women who: (a) are between the ages of 15 and 45; (b) have employer/union provided health insurance; and (c) have HIU income under the relevant percent of the FPL to qualify for that State's program. That initial estimate is further refined (Column 4) based on the percentage of enrollees in self-insured employer plans in each State (Column 3), provided that

the State has a contraceptive equity law. We recognize that other data sources and methodologies may achieve different results. Whatever the precise calculations, however, the ultimate conclusion—that millions of women with employer-sponsored insurance are income-eligible for state-funded programs—remains accurate.

[2] For each State on the list, the following is the highest FPL for a broadly applicable program that is at least partially state funded: California—200% (Family PACT); Connecticut—263% (Medicaid Family Planning Expansion); Delaware—250% (Title X); Hawai'i—250% (Title X); Iowa—300% (Family Planning Program); Maryland—250% (Title X); Massachusetts—300% (Sexual Reproductive Health Program); Minnesota—200% (Family Planning Program); New York—223% (Family Benefit Program); Oregon—250% (Oregon Contraceptive Care); Pennsylvania— 220% (Medicaid Family Planning Expansion); Vermont—200% (Department of Health Global Commitment Investment Grant); Virginia—200% (Plan First Program); Washington—260% (Take Charge Program).

[3] The percentage of self-insured plans is taken from: U.S. Dept. of Health & Human Services, Medical Expenditure Panel Survey, *Percent of private-sector enrollees that are enrolled in self-insured plans at establishments that offer health insurance by firm size and State: United States, 2016*, https://meps.ahrq.gov/data _stats/summ_tables/insr/state/series_2/2016/tiib2b1.pdf (ARHQ Database). In many cases, the ARHQ Database provides significantly lower self-insured coverage rates than other sources. Consistent with other efforts, we have used the figures provided by the Database to provide a conservative estimate.

[4] All of the listed States, except Minnesota, Pennsylvania and Virginia have contraceptive equity laws that generally require state-regulated plans to cover all FDA-approved forms of contraception.

**TABLE 2**

**Number of Women with Employer-Sponsored Insurance Who Are Income Eligible for Medicaid as Secondary Payer for Contraceptive Services[5]**

| State | Insured, Income-Eligible Women Between the Ages of 15 and 45[6] | Percent of Enrollees Covered Under a Self-Funded Plan | Insured, Income-Eligible Women Between the Ages of 15 and 45 in Self-Funded Plans |
|---|---|---|---|
| Connecticut | 85,157 | 59.3% | 50,498 |
| Delaware | 25,163 | 68.3% | 17,186 |
| Hawaiʻi | 44,278 | 37.6% | 16,649 |
| Maryland | 168,016 | 49.6% | 83,336 |
| Massachusetts | 195,584 | 56.6% | 110,701 |
| Minnesota | 127,349 | N/A | 127,349 |
| Oregon | 99,246 | 53.7% | 53,295 |
| Pennsylvania | 376,451 | N/A | 376,451 |
| Rhode Island | 32,695 | 47.9% | 15,661 |
| Vermont | 18,613 | 60.2% | 11,205 |
| Washington | 160,796 | 57.4% | 92,297 |
| **Total** | **1,333,348** | | **954,628** |

[5] The Medicaid program serves as a secondary payer for contraceptive services in each of the States listed in Table 2.

[6] For all States listed in this table, the relevant Medicaid FPL used to calculate the figures is 138%.